Mohr Partners, Inc. v. Elior, Inc., 2025 NCBC 24.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23 CVS 2657

MOHR PARTNERS, INC., a Texas
corporation,

Plaintiff,

v.

ELIOR, INC., a Delaware
corporation,

Defendant.

**ORDER AND OPINION ON CROSS-
MOTIONS FOR SUMMARY
JUDGMENT AND DEFENDANT'S
MOTION FOR LEAVE TO AMEND
ANSWER**

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment (ECF No. 55), Defendant's Motion for Leave to Amend Answer ("Motion to Amend," ECF No. 58), and Plaintiff's Motion for Summary Judgment (ECF No. 62) (collectively, the "Motions").

The Court, having considered the Motions and exhibits, the parties' briefs, the arguments of counsel, the applicable law, and all appropriate matters of record, **CONCLUDES** that Defendant's Motion to Amend should be **DENIED**; Defendant's Motion for Summary Judgment should be **GRANTED in part** and **DENIED in part**; and Plaintiff's Motion for Summary Judgment should be **GRANTED in part**, **DENIED in part**, and **DEFERRED in part**.

*Maynard Nexsen PC by David A. Luzum and James C. Smith, and C. Kyle Pugh, P.C., by Kyle Pugh for Plaintiff Mohr Partners, Inc.*

*Williams Mullen, by Killian Wyatt and Camden R. Webb for Defendant Elior, Inc.*

Davis, Judge.

## INTRODUCTION

1. In this Opinion, the Court addresses several issues concerning an exclusive representation agreement between a real estate broker and its client. Specifically, the Court must determine (1) whether the agreement entitled the broker to receive a commission for real estate transactions handled solely by the client; and (2) whether the unique circumstances concerning two discrete transactions in which the broker performed services justified the client's refusal to pay a commission to the broker.

## FACTUAL AND PROCEDURAL BACKGROUND

2. "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. LORD Corp.*, 2021 NCBC LEXIS 4, at **1–2 (N.C. Super. Ct. Jan. 19, 2021) (cleaned up).

3. Plaintiff Mohr Partners, Inc. ("Mohr") is a Texas corporation authorized to do business in North Carolina as a real estate firm. (Countercls. ¶ 15, ECF No. 37.)

4. Defendant Elior, Inc. ("Elior") is a Delaware corporation authorized to do business in North Carolina. Elior's principal place of business is in Mecklenburg County, North Carolina. (Am. Compl. ¶ 2, ECF No. 36.)

5. Elior is a hospitality company that provides contract catering and frozen pre-packaged meals to educational institutions, hospitals, senior care facilities, correctional institutions, and other governmental units. (Hunt Dep., at 24–25, ECF

No. 144.3.)  As of spring 2020, Elior had approximately 100 real estate holdings—both owned and leased properties—in North America.  (McNamara Dep., at 18–19, ECF No. 144.4.)

6.     Historically, Elior did not employ third parties to manage its real estate portfolio.  Instead, Elior handled real estate transactions internally, including negotiating sales and leases.  (Mohr Rule 30(b)(6) Dep., at 52, ECF No. 144.1.)

7.     In the spring of 2020, Elior's leadership team recognized that the shutdowns associated with the COVID-19 pandemic would likely result in Elior having a significant amount of empty, unused commercial office space for which it would be responsible for paying rent.  As a result, Elior's executives decided to retain a real estate broker to handle transactions involving Elior's leases and owned properties.  (Hunt Dep. at 44–45.)

8.     Oliver Poirot, the chief executive officer of Elior, contacted Robert Mohr, the founder and chief executive officer of Mohr, and requested that Mohr provide real estate services for Elior.  (Countercls. ¶ 17; Poirot Dep., at 47–48, ECF No. 57.5.)

9.     On 12 June 2020, Mohr prepared and sent a draft written contract to Elior.  (Mohr Rule 30(b)(6) Dep., at 35–37.)

10.    From June through July 2020, the parties negotiated the terms of the contract for the real estate services to be provided by Mohr.  (Mohr Rule 30(b)(6) Dep., at 35.)

11. On 10 August 2020, Elior and Mohr executed an "Exclusive Representation Agreement" ("ERA," ECF No. 80). The most relevant portions of the ERA stated as follows:

WHEREAS, Client [Elior] desires Mohr to be their Exclusive Real Estate Agent across North America for real estate services:

1. EXCLUSIVE RIGHT TO REPRESENT. Client hereby retains Mohr as its Exclusive Real Estate Agent as to Client's entire North American real estate portfolio, and grants to Mohr the exclusive right to represent Client on the following terms and conditions: Provided, however, that any such exclusivity shall not apply to any brokerage arrangement that may have been previously entered into by Client as set forth in Exhibit B. In addition, such exclusivity shall not apply to any locations or segment projects as also set forth in Exhibit B.

2. TERM. The term of this Agreement shall commence the day this Agreement is executed and shall be in effect for any transaction completed within three (3) years from the date of this Agreement (the "Initial Term"). Following the Initial Term, this Agreement shall continue without interruption until one party gives the other party at least sixty (60) days advance written notice of its intent to terminate this Agreement. However, Client and Mohr shall have the right to terminate this Agreement with or without Cause at any time with nine (9) months advance written notice to the other party. If a transaction is not completed within thirty (30) days past the expiration or termination of this Agreement, Mohr will submit to Client a written list of all properties that have been submitted to Client or evaluated by Client during the term of this Agreement. In the event a transaction is completed on any of the listed properties within one hundred eighty (180) days of the expiration of this Agreement, Client agrees that Mohr will be its agent as described above.

3. CLIENT RESPONSIBILITIES. Client shall cooperate with Mohr and agrees to refer all phone inquiries, offerings, and correspondence relating to commercial space, including early termination/buy-out negotiations, sales and acquisitions, sale-leasebacks, dispositions or subleases or assignments, new leases or renewals of existing leases, build-to-suit projects including lease and acquisition of land for such project, directly to Mohr. Mohr shall be the main point of contact on behalf of Client for all real estate related negotiations. Relative to

such negotiations and completion of the preceding assignments, Client agrees that Mohr shall receive the following fees as further described on Exhibit A attached hereto.

4. MOHR RESPONSIBILITIES. Mohr shall use its best efforts to implement cost savings strategies in the real estate portfolio of Client including but not limited to optimization of space use, negotiations with existing landlords to restructure and/or terminate existing leases, sublease or otherwise dispose of existing leases, secure proposals on any properties or transaction restructure to meet Client's criteria and shall assist Client in analyzing all the options presented to Client. As the overall real estate services integrator for Client, Mohr can utilize local co-brokers in various markets to achieve maximum cost reductions for Client.

(ERA, ¶¶ 1–4.)

12.     Following the execution of the ERA, Elior provided Mohr with a comprehensive list of its leases and details regarding expiration dates and monthly rent expenses. (Macnoll Dep., at 96–104, ECF No. 144.2.)

13.     Over the next two years, Mohr served as a real estate broker for Elior on various transactions. Elior's primary point of contact at Mohr was its General Counsel, Steve Macnoll. (Countercls. ¶¶ 22–23.)

14.     Unbeknownst to Mohr, however, during the time period in which the ERA was in effect, Elior handled certain additional real estate transactions in-house without utilizing the services of Mohr (or any other broker).[1] As a result, Mohr was not paid any commission for these transactions.

---

[1] Because the parties in their briefs refer to this practice as "self-servicing," the Court utilizes this term as well throughout this Opinion.

15. Elior's failure to pay a commission to Mohr for these self-serviced transactions forms the basis for one of the issues of dispute between the parties in this case.

16. The remaining two disputed issues both arise out of Elior's acquisition in May 2016 of a company called Preferred Meals Systems ("Preferred Meals"), an Illinois-based manufacturer of frozen food products. (Countercls. ¶ 10.)

17. Beginning in December 2021, Elior began making plans to sell the Preferred Meals business. (Countercls. ¶ 33.) The sale of Preferred Meals differed in character from Elior's usual lease termination projects, as Elior needed to sell its assets to buyers who could continue operations, take on union employees, and minimize Elior's liability under certain contracts. (Countercls. ¶ 34.)

18. Preferred Meals' real estate holdings included properties in a number of different locations nationwide. The two locations that are relevant to this case are its properties in Berkeley, Illinois (the "Berkeley Property"), and Moosic, Pennsylvania (the "Moosic Property"). (Countercls. ¶ 38.)

19. As discussed in extensive detail later in this Opinion, Mohr (through Macnoll) performed services on Elior's behalf regarding transactions involving both the Berkeley Property and Moosic Property. However, with regard to both transactions (albeit for different reasons), Elior refused to pay Mohr commissions pursuant to the ERA.

20. On 7 February 2023, Mohr initiated this action by filing a Complaint (ECF No. 3), in Mecklenburg County Superior Court. Mohr subsequently filed an

Amended Complaint on 1 August 2023, which contained a claim for breach of contract against Elior based on the unpaid commissions referenced above.

21. This matter was designated as a mandatory complex business case and assigned to the undersigned on 21 March 2023. (ECF Nos. 1–2.)

22. In response, Elior filed an Answer and Counterclaims on 14 April 2023, asserting counterclaims for breach of contract and recoupment. (ECF No. 13.) Elior subsequently filed new Counterclaims on 7 August 2023, reasserting those same claims and adding a new counterclaim for breach of fiduciary duty.

23. On 10 June 2024, Elior filed a Motion for Summary Judgment and a Motion for Leave to Amend. On that same date, Mohr filed a cross-Motion for Summary Judgment.

24. The Court held a hearing via WebEx on the Motions on 23 September 2024 at which all parties were represented by counsel.

25. The Motions have been fully briefed and are now ripe for resolution.

## LEGAL STANDARD

26. It is well established that "[s]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (cleaned up).

27.     On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.'" *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

28.     The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, . . . or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford,* 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

29.     When a party requests offensive summary judgment on its own claims for relief, "a greater burden must be met." *Brooks v. Mt. Airy Rainbow Farms Ctr.,*

*Inc.*, 48 N.C. App. 726, 728 (1980). The moving party "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985). For that reason, it is "rarely . . . proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

## ANALYSIS

### I.      Elior's Motion for Leave to Amend

30.      The Court elects to address Elior's Motion for Leave to Amend first.

31.      In this Motion, Elior requests leave from the Court to file an amended answer to Mohr's Amended Complaint. Specifically, Elior seeks to amend its Answer to assert that "no contract was formed between Elior and Mohr because the parties never reached a meeting of the minds on a material term of the ERA." (Mot. Amend, at 1.)

32.      Motions to amend are governed by Rule 15 of the North Carolina Rules of Civil Procedure. Rule 15(a) provides, in relevant part, as follows:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 30 days after it is served. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party, and leave shall be freely given when justice so requires.

N.C. R. Civ. P. 15(a).

33. Although Rule 15 states that leave shall be freely given, "the rules still provide some protection for parties who may be prejudiced by liberal amendment." *Vitaform, Inc. v. Aeroflow, Inc.*, 2021 NCBC LEXIS 79, at **11 (N.C. Super. Ct. Sept. 16, 2021) (quoting *Henry v. Deen*, 310 N.C. 75, 82 (1984)). As a result, an "amendment may be denied for reasons of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice, and futility of amendment." *Id.* (cleaned up). "The burden is upon the opposing party to establish that [it] would be prejudiced by the amendment." *Id.*

34. The decision whether to grant or deny a motion to amend is within the discretion of the trial court, and its decision will not be reversed unless it constitutes a manifest abuse of its discretion. *Id.*

35. "In deciding if there was undue delay, the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit." *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 679 (2013) (affirming trial court's denial of a motion to amend filed thirteen months after the initial complaint was filed).

36. On 31 May 2023, this Court entered a Case Management Order ("CMO," at 7, ECF No. 22), which provided that the deadline for the parties to file a motion to amend pleadings was 1 August 2023.

37. Discovery in this case closed on 31 January 2024. (CMO, at 5.)

38. Elior has offered the Court no valid reason or justification for the substantial delay in filing its Motion to Amend.

39.     Elior concedes that in both its original and amended Answers, it admitted that the ERA was a valid and binding contract between the parties.

40.     Both parties conducted discovery based on the premise that the ERA was a valid contract in all respects.  As a result, Mohr did not assert (and had no reason to assert) alternative quasi-contractual claims such as causes of action for unjust enrichment or *quantum meruit*.  Therefore, Elior's Motion to Amend is not only untimely but, if granted, would result in tangible prejudice to Mohr.

41.     Accordingly, for these reasons, the Court concludes that Elior's Motion to Amend should be **DENIED**.  *See Trail Creek Inves., LLC v. Warren Oil Holding Co., LLC*, 2023 NCBC LEXIS 128, at **13 (N.C. Super. Ct., Oct. 13, 2023) (denying motion to amend where moving party's amendment would fundamentally change theory of case).

## II.     Motions for Summary Judgment

42.     The Court next turns to the parties' cross-Motions for Summary Judgment.

43.     At the outset, it is helpful to identify the precise issues upon which the parties claim entitlement to summary judgment.

44.     Mohr seeks offensive summary judgment on the following issues: (i) whether the ERA required Elior to pay Mohr commissions for the real estate transactions that Elior self-serviced; (ii) whether Elior breached the ERA by failing to pay Mohr its commission for work performed on the Berkeley Transaction; and (iii) whether Elior breached the ERA by failing to pay Mohr its commission for work

performed on the Moosic Transaction. In addition, Mohr seeks summary judgment defensively in connection with Elior's counterclaims for breach of contract and breach of fiduciary duty.[2]

45. Elior, in turn, requests that the Court enter summary judgment in its favor defensively on Mohr's claim for breach of contract in its entirety.

46. The issues addressed by the parties in their respective briefs overlap to a significant degree. Therefore, rather than analyzing each party's arguments individually, the Court instead deems it appropriate to address the issues and arguments advanced by both parties together.

**A. Mohr's Entitlement to Commissions on Transactions Self-Serviced by Elior**

47. The issue of whether Elior was required to pay Mohr commissions for transactions that were self-serviced by Elior hinges on whether the ERA is properly found to be an "exclusive right to sell" agreement (as Mohr contends) or, alternatively, an "exclusive agency" agreement (as Elior asserts).

48. North Carolina's appellate courts recognize the distinction between these two types of brokerage agreements. An exclusive agency agreement is one that "precludes the principal from hiring another agent to sell the same property, but does not preclude the principal himself from procuring a customer without paying compensation." *Peeler Ins. & Realty, Inc., v. Harmon*, 20 N.C. App. 39, 42 (1973) (cleaned up).

---

[2] Although Elior also purported to assert a counterclaim for recoupment, the Court construes the request for recoupment as an attempt to obtain a remedy rather than as an independent legal claim.

49.     Conversely, an exclusive right to sell contract not only prevents the owner from using a different real estate broker but also "precludes the principal himself from competing with the agent." *Id*. Because an exclusive right to sell contract provides a more significant restriction on the property owner's rights, language creating this type of agreement must be explicitly set out therein. *See id*. ("Since alienation has become such an integral part of property, it is only proper that the [exclusive right to sell] contract specifically negative this right before it is lost.").[3]

50.     Our Court of Appeals has explained the consequences to an owner when an exclusive right to sell contract is utilized.

> [The owner] is liable for the commission which would have accrued if the broker had obtained a purchaser during the period of the listing. The broker need not show that he could have performed by tendering an acceptable buyer, or that he was the procuring cause of the sale. The owner may breach the agreement by arranging a sale in violation of the agreement or by action which renders the broker's performance impossible.

*Joel T. Cheatham, Inc., v. Hall*, 64 N.C. App. 678, 681 (1983).

51.     The Court observes that North Carolina is not an outlier in its approach to differentiating between these two types of brokerage agreements. *See, e.g.*, *DiSalle Real Est. Co., v. Howell*, 117 Ohio App. 3d 113, 117 (1996) ("[A]n agreement of agency for the sale of property should be construed, if possible, to give the owner himself the right to sell his property without incurring liability for the payment of a commission[.]"); *Lockhart v. Holiday Homes of St. John, Inc.*, 678 F.2d 1178, 1186 (3d

---

[3] The Court notes that at the 23 September hearing, counsel for Mohr conceded that under North Carolina law, this default rule preserves an owner's right to self-service absent express language waiving that right in a brokerage agreement. (Hearing Tr., at 43.)

Cir. 1982) "[A]n owner should not be deemed to have relinquished the right to sell his own property through his own efforts except by clear and unequivocal language in the contract."); *Foltz v. Begnoche,* 222 Kan. 383, 388 (1977) ("Additionally, we are persuaded that an 'exclusive right to sell,' by its very nature should be created only by clear and unambiguous language.").

52.     In its Motion, Mohr takes the position that the ERA is an exclusive right to sell contract and that, as a result, Elior had no ability to self-service any real estate transactions (with the exception of those transactions that fell within the exemptions expressly set forth in Exhibit B to the ERA).

53.     In support of this argument, Mohr asserts that the following language in the ERA emphasizes the exclusivity to be conferred upon Mohr:

> WHEREAS, Client [Elior] desires Mohr to be their Exclusive Real Estate Agent across North America for real estate services:
>
> 1. EXCLUSIVE RIGHT TO REPRESENT.  Client hereby retains Mohr as its Exclusive Real Estate Agent as to Client's entire North American real estate portfolio, and grants to Mohr the exclusive right to represent Client on the following terms and conditions: Provided, however, that any such exclusivity shall not apply to any brokerage arrangement that may have been previously entered into by Client as set forth in Exhibit B.  In addition, such exclusivity shall not apply to any locations or segment projects as also set forth in Exhibit B.
>
> . . .
>
> 3. CLIENT RESPONSIBILITIES.  Client shall cooperate with Mohr and agrees to refer all phone inquiries, offerings, and correspondence relating to commercial space, including early termination/buy-out negotiations, sales and acquisitions, sale-leasebacks, dispositions or subleases or assignments, new leases or renewals of existing leases, build-to-suit projects including lease and acquisition of land for such project, directly to Mohr.  Mohr shall be the main point of contact on behalf of Client for all real estate related negotiations. Relative to such

negotiations and completion of the preceding assignments, Client agrees that Mohr shall receive the following fees as further described on Exhibit A attached hereto.

(ERA, ¶¶ 1, 3.)

54. Mohr contends that the *only* carve-outs under the ERA that allowed Elior to either self-service or use another broker in connection with its North American real estate transactions are those set out in Exhibit B, which provided as follows:

Brokerage agreements previously entered into by Client:

- Sublease or Direct Lease replacement of the existing 242 Salem Street location in Woburn, MA

  Perishable Management Services (PMS)
  Joel Miller/Melissa Chaput–Brokers
  321 Columbus Avenue #7
  Boston, MA 02116

- Sublease or Direct Lease replacement of 211 South Hill Road in Brisbane, CA

  Scott Delphey
  Food Properties Group
  1313 Foothill Blvd.
  Suite 4
  La Canada, CA 01011

Exclusivity will not apply to the following locations or segment projects; however, Client can review these locations or segment projects with Mohr to mutually agree upon real estate services as appropriate. Client agrees to honor all terms in the Representation Agreement for any locations or segment projects that Mohr provides real estate services for.

- Client locations or segment projects with monthly lease expenses of less than five thousand dollars ($5,000) per month.

(ERA, Ex. B.)

55.     Mohr argues that the language in Paragraph 3 of the ERA requiring Elior to refer to Mohr all communications regarding its real estate portfolio satisfies the requirement that a property owner "specifically negative" its right to self-service. (Pl.'s Br. Supp. Pl.'s Mot. Summ. J., at 17–18, ECF No. 63.)

56.     Mohr further notes that this provision is preceded by the word "shall," which, Mohr contends, serves to eliminate all discretion that Elior would otherwise possess to handle its own transactions, thereby avoiding an obligation to pay a commission to a broker.

57.     Elior, conversely, argues that the ERA is instead an exclusive agency agreement—most basically, because the ERA fails to contain language expressly excluding Elior's right to self-service its own real estate transactions. Based on the absence of such explicit language, Elior contends, the ERA only requires that Mohr be paid a commission for all transactions in which (i) Elior chooses to engage a broker; and (ii) the exclusions contained in Exhibit B are inapplicable.

58.     Elior also contends that this interpretation is supported by the initial language in the first numbered paragraph of the ERA, which reads: "[Elior] retains Mohr as its Exclusive Real Estate Agent." (ERA ¶ 1.) This language, Elior asserts, makes clear that the ERA merely makes Mohr its exclusive broker *for those transactions for which Elior decides to use a broker*.[4]

---

[4] Elior also notes that the title of the agreement is "Exclusive Representation Agreement," which—according to Elior—suggests that the word "exclusive" modifies the term "representation"—thereby confining the concept of exclusivity to Elior's selection of a broker.

59. In addition, Elior points to language in the ERA providing that Mohr would only be compensated "upon completion of the preceding assignments." (ERA ¶ 3.) Elior argues that the inclusion of the word "assignments" implies that Mohr would not be working on *all* of Elior's real estate transactions and that, instead, Elior would have discretion in determining whether to bring Mohr into a transaction as opposed to handling the transaction in-house.

60. For these reasons, Elior takes the position that it was entitled to self-service its own transactions any time it desired and that, in such circumstances, Mohr was not entitled to be paid a commission.

61. After careful consideration of the parties' arguments, the language of the ERA, and the applicable case law, the Court agrees with Elior on this issue.

62. As stated above, North Carolina law requires express language relinquishing an owner's right to sell its own property in order for a brokerage agreement to be deemed an exclusive right to sell agreement.

63. Not only is there no such language expressly relinquishing this right, but, in fact, there is no reference to self-servicing in the ERA *at all*.

64. Moreover, contrary to Mohr's argument, Exhibit B is most logically read as simply setting out specific properties (or categories of properties) that are not subject to the ERA at all—meaning that Elior would be permitted to retain a different broker for those transactions. Indeed, in paragraph 1 (titled "EXCLUSIVE RIGHT TO REPRESENT"), the ERA recites Mohr's retention as Elior's "Exclusive Real Estate Agent" and then states as follows: "Provided, however, that any such

exclusivity shall not apply to any brokerage arrangement that may have been previously entered into by [Elior] as set forth in Exhibit B. In addition, such exclusivity shall not apply to any locations or segment projects as also set forth in Exhibit B." (ERA ¶ 1.)[5]

65. The language in the ERA relied upon by Mohr falls short of expressly waiving Elior's self-service rights. In essence, Mohr is asking the Court to discern an *implied* relinquishment of such rights. The Court must decline that invitation because such an approach is not permitted under North Carolina law.

66. Although not a ground for its ruling on this issue, the Court observes that this result is also consistent with the course of dealing between the parties as reflected in the summary judgment record. Macnoll was the employee of Mohr who worked most closely with Elior in providing broker services pursuant to the ERA. The record contains a number of communications between Macnoll and Elior's representatives in which Macnoll requested that Elior assign certain transactions to Mohr.[6] The implication from these communications is that the parties recognized the fact that the ERA did not preclude Elior from opting to self-service its own transactions (instead of seeking brokerage assistance from Mohr).

67. In light of the Court's conclusion that the ERA did not require Elior to pay commissions to Mohr for transactions in which Elior engaged in self-servicing,

---

[5] Specifically, the first two carve-outs in Exhibit B identify properties in which Elior appears to have used a different real estate broker. The third carve-out is for properties where the monthly lease expense is less than $5,000.

[6] (*See*, *e.g.*, ECF Nos. 57.4 and 128.1.)

Elior's Motion for Summary Judgment on this issue is **GRANTED**, and Mohr's Motion for Summary Judgment on this issue is **DENIED**.

### B. Moosic Transaction

1. Mohr also asserts that Elior breached the ERA by failing to pay Mohr the commission it earned for its work on the Moosic Transaction.

2. As noted earlier, the Moosic Transaction relates to the sale of Preferred Meals' manufacturing facility in Moosic, Pennsylvania, which was owned by Elior. (Hunt Dep., at 155–59, 161, 167, 175.) At the Moosic location, frozen meals were manufactured and stored, and were later shipped to distribution centers and then delivered to schools. (Hunt Dep., at 197–98.)

3. Elior makes two arguments in support of its position that it does not owe a commission to Mohr. First, it asserts that the sale of the Moosic Property was not within the scope of the ERA because it occurred within the context of a much larger merger and acquisition—namely, the sale of its Preferred Meals subsidiary. Second, Elior contends that it did not actually assign the Moosic Transaction to Mohr.

4. The Court rejects both of these arguments.

5. "The elements of a claim for breach of contract are the existence of a valid contract and a breach of that contract's terms." *JT Russell & Sons, Inc. v. Russell*, 2024 NCBC LEXIS 35, at **9 (N.C. Super. Ct. Feb. 28, 2024) (citing *Poor v. Hill*, 138 N.C. App. 19, 26 (2000)).

6. In analyzing the parties' arguments, it is necessary to understand the factual context in which the Moosic Transaction occurred.

7. Elior's business was significantly impacted by the COVID-19 pandemic. Due to the nationwide closure of schools, Elior's subsidiary, Preferred Meals, lost much of its customer base during this time period. Preferred Meals had suffered revenue losses of $50 million in both 2021 and 2022. (Hunt Dep., at 198.)

8. Jeffrey Hunt, the chief financial officer of Elior, testified that Elior sought to sell its Preferred Meals division through a single merger and acquisition transaction. (Hunt Dep., at 149–50.)

9. Such a transaction, Hunt testified, would be complex because Preferred Meals' business operations were themselves complicated. Preferred Meals was a going concern that operated in multiple locations, maintained a number of employees, and had existing executory contracts for the production of food products as well as union contracts and leases of real property, equipment, vehicles, and subleases.

10. Hunt, in his testimony, characterized the sale of Preferred Meals as "multidimensional chess" and noted that the disposition of Preferred Meals would not be "a clean, straight real estate transaction." (Hunt Dep., at 173.)

11. In its first argument, Elior contends that because the Moosic Property was sold in connection with Elior's sale of its Preferred Meals Systems subsidiary, it falls outside the scope of the ERA in that the transaction involving the Moosic Property was merely one part of a larger, complex transaction encompassing multiple other issues that were outside the expertise of a real estate broker such as Mohr.

12. The problem with this argument is that there is no language in the ERA that exempts real estate transactions occurring as the result of a sale of a business.

Elior does not dispute the fact that the Moosic property was within Elior's North American real estate portfolio during the relevant time period. Moreover, it was not within the carve-outs contained in Exhibit B to the ERA.

13. The parties could have added language to the ERA excluding transactions taking place within the context of a larger business transaction, but did not do so. This Court does not possess the authority to judicially insert such a provision. *See, e.g., Trail Creek Invs.* at \*14–15 ("Notably, the Court lacks the authority to judicially insert language into an unambiguous contract (language that the parties themselves did not see fit to include) based simply on arguments as to their alleged intent.").

14. Nor is the Court persuaded by Elior's second argument, which asserts that the Moosic Transaction was never formally assigned to Mohr. The record paints a much different picture, clearly establishing that Mohr was, in fact, assigned to sell the Moosic Property by Elior and that its agent, Macnoll, performed brokerage services on Elior's behalf for this purpose.

15. Hunt testified that, with regard to the sale of the Moosic Property, Elior was "on the clock and wanted to get to resolution as fast as we could, because we had shut down a business, we're not earning revenue, so we wanted to resolve these and move as fast as we possibly could." (Hunt Dep., at 177, 200.)

16. On 22 May 2022, Hunt wrote in an email to Paul Altobelli (the president of Preferred Meals):

Olivier [Poirot] okay'd using Mohr for Berekely [sic] and Moosic for 'brokered' services.[7]  We can still entertain 'direct' offers from existing clients (Co-Pack) and prospective buyers from Rubik (e.g. Whitsons). Steve from Mohr will ask to visit both properties in person.

(Hunt Dep., at 177.)[8]

17.    On 23 May 2022, Macnoll sent an email to Hunt with the subject line "[External] Moosic and Berkeley – Plans and Equipment List" that stated in relevant part as follows:

Jeff,
I am trying to get copies of plans (hard copies and electronic AutoCAD) and equipment lists for Moosic and Berkeley.  Attached are samples from what I received for Commerce California.  Anything you can find and send to me would be very helpful.  Getting of [sic] a lot of calls from brokers with interested parties. News travels really fast.

(Ex. 17, ECF No. 82.)

18.    In an internal email sent by Hunt to Poirot on that same date, Hunt stated: "Mohr (Steve) is willing to help us sell Moosic and find company to preserve jobs.  He is in NY City this week visiting family and asked if he could visit Moosic. . . [S]hould we short term pause Moosic with Mohr and/or others?"  (Ex. 16, at 3, ECF No. 81.)

19.    On 24 May 2022, Hunt responded to Macnoll's email from the previous day as follows: "Green light on Mohr moving forward on Berkeley and Moosic."  (Ex. 17, ECF No. 82.)

---

[7] Hunt testified that the phrase "brokered services" referred to using a real estate agent. (Hunt Dep., at 179.)

[8]  In addition, Goodman, whose job duties involved Preferred Meals' real estate activities, was told that "if we're going to do any brokered transactions, we will be using Mohr."  (Hunt Dep., at 186.)

20.     In addition, Macnoll testified that Hunt instructed him during a phone call regarding Moosic that same day to "[p]ut it on the market.  Sell it."  (Macnoll Dep., at 88.)

21.     Macnoll proceeded to "market[ ] the [Moosic] building for sale."  (Macnoll Dep., at 165.)   In his deposition, he testified that he performed the following tasks: (1) he took pictures of the building; (2) he created sales brochures; (3) he listed the building on CoStar, a commercial real estate database; (4) he solicited prospects for purchase of the property; and (5) reviewed letters of interest, fielded calls, and corresponded by email with potential purchasers.  (Macnoll Dep., at 166–67)

22.     On 26 May 2022, Macnoll emailed Hunt the following:

On Moosic, I have had 16 inquiries so far.  A lot of demand for this.  I will price high.  Most/all are brokers that should have clients in tow.  I have not called most of them back since they will want information on the plant that I don't have yet.  I have yellow highlighted [a] few users that I know of which could be interesting. . . . Let me know what else you need.

(Ex. 18, at 1, ECF No. 83.)

23.     Mark Goodman, a Preferred Meals employee, sent a 27 June 2022 email to Poirot, Hunt, Brittany Mayer-Schuler (an attorney for Elior), Devon Hilton (Elior's senior vice-president), and Macnoll, with the subject line "Fwd: Moosic, PA Fresh N Lean":

Offer from Fresh n Lean. Very disappointing.  Comps they are using need to be analyzed and others presented. They are valuing building around $35–$40 per foot, which is half what I think it is and way less than what Steve valued it at.

Opening offer but they are planning to visit Thursday so we need to discuss quickly. . . . Added Steve as comps will be the key to negotiations.

(Ex. 19, ECF No. 84.)

24. Hilton sent an email to Macnoll on 28 June 2022 asking the following question: "Can you let me know when we should expect to get the comps for Moosic? We need this to go back to Fresh-n-Lean today." (Ex. 21, ECF No. 86.)

25. Macnoll responded via email to Elior that same day by providing sales "comps" for the Moosic facility. He concluded that the average sales price for similar facilities was $111 per square foot. Macnoll also included an attachment analyzing nineteen comparable food processing and cold storage facilities. (Ex. 22, at 1–6, ECF No. 87.)

26. Goodman sent Macnoll's figures on the Moosic facility to Fresh N Lean by email on 28 June 2022. (Ex. 39, at 1, ECF No. 104.)

27. Additionally, on 28 June 2022, Macnoll sent a separate email to Elior stating his plans to drive to the Moosic facility the following week from New York City to take photographs for marketing purposes and provide property tours for interested purchasers. (Ex. 23, ECF No. 88.)

28. In a series of Microsoft Teams messages between Altobelli and Hilton on 29 June 2022, the two Elior executives acknowledged Macnoll's planned trip to visit the Moosic Property and debated the prospect of completing the sale without Mohr's assistance:

Altobelli: Hilco is 5–6% for lease negotiations

Altobelli: They are running market comps now, then they will get back to me on what they think

Hilton: Same as Mohr

Hilton: Mohr is dragging their feet to give us comps for Moosic

…

Altobelli: Shocked OP [Olivier Poirot] let Mohr into Moosic, Mark can get it to 7M

Altobelli: without Steve

Altobelli: why pay him anything

Hilton: We probably won't, and OP would probably take it at 7 with inventory and people

Altobelli: We will see how it plays out. I see you told Steve he can go to Moosic

Hilton: Olivier likes the duel [sic] effort. I hope Mark can get them up before next week

Hilton: And then we call off Mohr

(Ex. 29, at 2–3, ECF No. 94.)

29.     On 6 July 2022, Fresh N Lean offered Elior $7,500,000 for the purchase of the Moosic facility. (Ex. 24, at 2, ECF No. 89.)

30.     The following day, Macnoll sent an email to Elior, providing a redlined copy of the Fresh N Lean offer with his comments. (Ex. 24, at 1.) In those comments, Macnoll entered Mohr's contact information at Paragraph 13, titled "Real Estate Commission," and included the following language:

Seller is represented by Mohr Partners, Inc. ("Mohr"). Mohr shall be responsible for paying at Closing any broker that Purchaser identifies as its broker representative in this transaction pursuant to Mohr's national listing agreement dated July 24, 2020 with Seller.

(Ex. 25, at 12, ECF No. 90.)

31. The contract for the Moosic sale was signed by Poirot on 16 July 2022. (Ex. 11, at 39, ECF No. 76.) Paragraph 13 of the contract did not, however, contain the above-quoted language proposed by Macnoll; to the contrary, it stated that no real estate commissions were due for the transaction. (Ex. 11, at 33.)

32. Fresh N Lean was ultimately unable to close the sale of the Moosic Property. Instead, it introduced Elior to a prospective new third-party buyer who purchased only the Moosic real estate. (Countercls. ¶¶ 91–92.)

33. No real estate agent or broker received credit for procuring the buyer for the Moosic Property. (Countercls. ¶ 95.)

34. Macnoll emailed Hilton on 28 September 2022, inquiring about the closing date for the sale of the Moosic Property to Fresh N Lean. (Ex. 41, ECF No. 106.)

35. On 29 September 2022, Hilton responded to Macnoll's email of 28 September by simply stating: "We closed." (Ex. 41.)

36. On 4 October 2022, Macnoll emailed Hunt and Brian Herrmann (Elior's corporate controller/treasurer) with an attached invoice regarding the sale of the Moosic Property. The invoice referenced the sales price paid as $7,500,000 and sought payment to Mohr in the amount of $450,000 (based on a 6% commission). (Ex. 20, at 2, ECF No. 85.)

37. To date, Mohr has not received any commission from the Moosic Transaction.

38.     The Court has painstakingly reviewed the record regarding the Moosic Transaction and concludes that no genuine issue of fact exists on the issue of whether Mohr is owed a commission.  The uncontradicted evidence shows that Elior assigned the Moosic Transaction to Mohr's agent—Macnoll—and that Macnoll performed brokerage services on Elior's behalf regarding the sale of the property.  Therefore, under the ERA, Mohr was entitled to receive a commission for this transaction.

1.      Accordingly, the Court concludes that Mohr's Motion for Summary Judgment is **GRANTED** on the issue of whether Elior breached the ERA by failing to pay Mohr a commission for its work on the Moosic Transaction.  To the extent that Elior seeks summary judgment on this same issue, its motion is **DENIED**.

2.      The Court will **DEFER** until a later date a ruling regarding the precise amount of the commission to which Mohr is entitled.

## C.      Berkeley Transaction

108.    The Berkeley transaction is the subject of competing breach of contract claims by the parties.  Mohr contends that Elior breached the ERA by failing to pay the commission for the transaction to which Mohr was entitled under the ERA based on Macnoll's work on Elior's behalf.

109.    Conversely, Elior (although conceding that it assigned the Berkeley Transaction to Mohr) argues that Macnoll mistakenly conveyed an unauthorized offer during negotiations he was conducting on Elior's behalf with a third party that left out a key term valued by Elior.  As a result of this mistake, Elior asserts, not only was it excused from any obligation to pay Mohr a commission as to Berkeley, but also

that it possesses affirmative claims against Mohr for breach of contract and breach of fiduciary duty.

110. Once again, an understanding of the relevant factual chronology is necessary in order to understand the parties' respective arguments.

111. In its production kitchens (including the one at the Berkeley, Illinois location), Preferred Meals manufactured "fresh and frozen snacks, meals and entrees for contract catering and home delivery." (Countercls. ¶¶ 10–11, 38)

112. Although Berkeley and Moosic were both parts of the Preferred Meals division, the Berkeley facility differed in at least one key respect from the Moosic Property. Unlike the Moosic location, the Berkeley location was not owned by Preferred Meals. Instead, it was leased from an entity called Provender Partners ("Provender"). (Hunt Dep., at 259.)

113. In 2020, when Elior engaged Mohr to handle its real estate portfolio, Preferred Meals was in default under a number of its facility leases, including the lease for the Berkeley location. (Mohr Rule 30(b)(6) Dep., at 16–17, 22–23, 188; McNamara Dep., at 50–52.)

114. The Preferred Meals lease for the Berkeley location was a "triple-net absolute lease [which] required [Preferred Meals] to repair the parking lot [and] maintain the roof." (Macnoll Dep., at 79.) Macnoll testified that Preferred Meals, however, "did not do that. [It was] in default. [It was] being sued repeatedly by Provender since 2020." (Macnoll Dep., at 79.)

115. In June 2020, Elior engaged Mohr to negotiate a restructuring of the Berkeley lease with Provender. (McNamara Dep., at 53.)

116. This restructuring was complicated by the fact that

finding an assignee to take the lease from Preferred Meals required approval of the landlord of the Berkeley facility, Provender . . . Elior needed to settle a legal dispute with Provender over the facility; transfer inventory and contracts; transfer truck leases, equipment, and related liabilities, mitigate employee and related union issues by trying to sell a continued business that transferred the largest number of employees to the buyer; and crucially, find a buyer to satisfy Elior's potentially expensive contractual commitment to produce ready-to-eat packaged sandwiches for Classic Delight, LLC that extended into 2023.

(Countercls. ¶ 44.)

117. From December 2021 until May 2022, Elior sought to sell Preferred Meals to a single buyer. (Countercls. ¶ 35.)

118. One prospective buyer of Preferred Meals was Whitsons Culinary Group ("Whitsons"), but Elior and Whitsons could not agree on terms for a global sale of the Preferred Meals division. (Countercls. ¶ 36.)

119. In May 2022, Elior decided to "sell the Preferred Meals business in pieces to potential buyers." (Countercls. ¶ 37.)

120. Although Whitsons had previously declined to purchase the entirety of Preferred Meals, it expressed an interest in assuming the lease obligations for the Berkeley facility in June 2022. (Countercls. ¶ 45.)

121. During that time period, Macnoll presented Provender with letters of intent from potential lease assignees, Amity Meat and Hello Fresh. (Mohr Rule 30(b)(6) Dep., at 193–94.)

122.    Macnoll testified that later he learned that Poirot preferred the lease assignee to be Whitsons.  (Mohr Rule 30(b)(6) Dep., at 194.)   Hilton informed Macnoll in late June 2022 that Elior anticipated an offer from Whitsons in this regard.  (Mohr Rule 30(b)(6) Dep., at 195.)

123.    On 29 June 2022, Hilton contacted Macnoll with details about a proposed deal with Whitsons, providing a term sheet and asking Macnoll to contact Provender to negotiate the lease assignment.  (Countercls. ¶ 47.)

124.    On 12 July 2022, Poirot, Michael Bailey (chairman of Elior's board of directors), Hilton, and Tom Heim (one of Elior's attorneys) held a conference call with Macnoll to discuss the terms of a proposed lease assignment to Whitsons for Provender's approval.  (Mohr Rule 30(b)(6) Dep., at 198.)   Hilton testified that during this call the key terms of the offer were reiterated to Macnoll, which consisted of the following: (1) the lease assignment to Whitsons would include a release of Elior's guaranty of the lease; (2) Elior would pay six months' rent to Provender as a lease termination fee; (3) Elior would replace or repair the roof and the parking lot at the facility; and (4) Whitsons would not be bound by an automatic renewal of the lease, and instead would have the option to terminate the lease at the conclusion of the lease term.  (Hilton Dep., at 190.)

125.    Macnoll, conversely, testified as follows regarding the discussion that took place during the conference call:

> I said that Provender was not going to easily approve any lease assignment.  They had just filed a declaratory judgment a couple of days prior to that against Elior, requesting the Court's approval of a litigator [sic], that they do not have to approve anything.  So I updated the team

on July 12th that it was going to be a hard negotiation for the lease assignment approval.

. . .

I informed the team at the time that in May Elior had come to terms with Provender prior to them announcing the shutdown, that Elior had agreed to a five-year extension of the lease, not an option to extend, but a five-year extension right now to take the lease five years past the current expiration date of 2026 with the rent for those back five years to be determined at fair market value. Other settlement terms were Elior would repair the roof and the parking lot for their obligations of the lease and take six months' rent as a settlement fee – settlement.

(Mohr Rule 30(b)(6) Dep., at 199–200.)

126. Later in his testimony, Macnoll denied that a required term of the offer he was asked by Elior to tender to Provender was that Whitsons would have the option—but not the obligation—to extend the lease at the end of the lease term. Instead, he testified, "I was instructed to take a firm five-year extension at fair market value, not an option, but an extension back to Provender." (Mohr Rule 30(b)(6) Dep., at 203.)

127. Bailey sent an email to Poirot, Heim, Hilton, Altobelli, and Macnoll on 12 July 2022 stating the following:

I have spoken with Paul [a representative of Whitsons] about the building.

My first question was are you fully up to speed with the annual cost of the building and he said I think so and went on to say $1.4M so I said and Taxes? And he said $300K. I told him $600k and his reaction was Ok. I reminded him that we have a very difficult landlord and he was likely to dispute Whitson's financials (for the hell of it) because the rent is 50% below market.

I also mentioned we (Elior) were on the hook for some significant repairs which we will take care of. I asked him about his long term strategy for the building and his view on wanted [sic] to be there in 3 or 5 years time.

His reply was we are looking at this space for the long term. He recognizes that he could not find anything remotely like it and he clearly has spent a lot of time looking.

I then suggested that we might need to get creative to get the landlord to agree to assigning the lease. I told him we had a couple of options that may help. The first being to take a lease extension for 5 years at market rent with an option to walk if the new rent was unacceptable. He is fine with this. His comment was well for an additional $1M it's well worth it.

I then explained Option 2 — pay more rent in years 3 and 4. He was less keen on that but his answer to Option one tells me that he would consider doing it.

(Ex. 30, at 2, ECF No. 95.)

128. Macnoll responded to Bailey's email on that same date by stating: "Yes, I will convey our settlement offer as discussed with Option 1 (5-year extension at FMV) to the Landlord ASAP." (Ex. 30, at 1.)

129. On 13 July 2022, Macnoll sent the following email to Poirot, Hilton, Altobelli, Bailey, and Heim:

Team, Provender just approved our proposed settlement framework as I outlined below:
Settlement offer **only relating** to Provender approval of <u>lease assignment</u> with Whitsons:
- Elior to pay for entire roof replacement
- Elior to pay for entire parking lot repaving
- Full release of PMC [Preferred Meals] and Elior Inc.
- Elior to pay 6 months' of base rent to Provender
- Elior/PMC to extend lease for 5 years at FMV (FMV to be determined in 2026)

Several details/mechanics to work out but we will get there. Provender said they will need the Parent Guaranty.

(Ex. 10, at 10) (emphasis in original).)

130. Poirot responded to Macnoll's 13 July email, in relevant part, as follows:

Brilliant! Sounds like another miracle! Well done team.
As you said Steve full speed ahead to solidify the deal with W, and then solidify the deal with our LL.

(Ex. 10, at 10.)

131. Macnoll testified that following his own 13 July email, "Michael Bailey sent an email shortly thereafter, something to the effect that he would–did not understand what was offered to Provender. He didn't understand. He had a different understanding of what I was authorized to offer to Provender." (Mohr Rule 30(b)(6) Dep., at 215.)

132. According to Macnoll, another conference call was held between Macnoll, Heim, Hilton, Bailey, and Poirot. During that call, the Elior team instructed Macnoll to return to Provender and renegotiate the lease extension term such that it would not be a firm five-year extension, but that Whitsons would have an option to renew the lease at a later date. (Mohr Rule 30(b) Dep., at 219–20.)

133. Elior contends that the offer Macnoll communicated to Provender was not fully consistent with the terms he had been authorized to convey. In particular, Elior asserts that Macnoll's failure to articulate that Whitsons did not want to be bound by an automatic renewal of the lease was a serious error because Whitsons (during its negotiations with Elior) had not agreed to extend the lease term at the end of five years. (Hilton Dep., at 186–89.)

134. Hilton testified that from Elior's perspective, the lease extension issue served as leverage regarding other components of the lease assignment, including the required parking lot and roof repairs. (Hilton Dep., at 250–52.)

135. Macnoll, however, testified that no one from Elior characterized his offer to Provender as unauthorized or the result of a misunderstanding. "They told me to go back and there was – they had spoken to Whitsons after they authorized my offer and Whitsons did not want to do a firm five-year extension and to go back to Provender." (Mohr Rule 30(b)(6) Dep., at 219.)

136. On 15 July 2022, Provender offered to accept the Whitsons assignment, but included the following terms, which were different than those communicated by Macnoll on 12 July 2022: "[A] twenty-five percent contingency on Elior's repair payment, increasing the proposed termination fee to $900,000, and automatically extending the term of the lease by five years at to-be-determined fair market rent." (Countercls. ¶70.)

137. Elior contends that Whitsons' desire to reserve the right to decline renewing the lease once it expired in 2026 was a material term of the negotiations with Provender and that Macnoll was not authorized to make or accept any offer that did not include this term.

138. As a result of their belief that Macnoll had failed to properly carry out his instructions, Hilton and Bailey took over the negotiations with Provender regarding the lease assignment. (Countercls. ¶¶ 61, 73–76.)

139. On 18 July 2022, Bailey sent the following email to Poirot, Hilton, Altobelli, Heim, and Macnoll:

> As I mentioned, I got PW [a representative of Whitsons] to agree to a 5 year extension on the Berkeley lease based on market rates at that time. (2026) I have been back to John Long at Provender and got him to agree

to the terms laid out in Steve Macnoll's letter. Needless to say he asked me for 8 months rent not 6 and I told him that was not what we agreed He accepted that, so we have a deal in principle.

(Ex. 10, at 15.)

140. In this lawsuit, Elior asserts that Macnoll's unauthorized offer to Provender negatively impacted the final settlement that was reached to assign the lease to Whitsons. This is so, Elior maintains, because the unauthorized offer became the new baseline for Elior's negotiations with Provender. (Countercls. ¶ 77.)

141. Despite Elior's belief that Macnoll had misstated the terms of the offer to Provender, it continued to seek Macnoll's assistance in negotiating the terms of Elior's required roof and parking lot repairs. (Countercls. ¶ 78.)

142. Throughout July 2022, Macnoll continued to negotiate with Provender on behalf of Elior regarding roof and parking lot repairs that were part of the Berkeley Transaction. Macnoll ultimately secured a deal with Provender pursuant to which Elior would repair—rather than replace—the roof. (Hilton Dep., at 206–11.)

143. Elior obtained an estimate of $1,500,000 to replace the roof at the Berkeley facility. (Ex. 31, at 6, ECF No. 96.)

144. Through Macnoll's negotiations with Provender, the landlord agreed to accept a repair of the roof, at a cost of $625,000, rather than a full roof replacement. (Ex. 31, at 2; Ex. 33, ECF No. 98.)

145. On 8 September 2022, Macnoll sent an email to Hunt with an invoice for $945,848.45 for the work performed by Mohr relating to the Berkeley lease

assignment. Mohr's calculated fee represented 10% of the gross savings of $9,458,484.48 delivered to Elior due to the lease assignment. (Ex. 26, ECF No. 91).

146. On 5 October 2022, Hunt sent Macnoll Elior's breakdown of a $256,143 fee it was willing to pay Mohr for the Berkeley transaction. Notably, Elior discounted Elior's gross savings by subtracting the amounts paid by Elior for the roof repair ($679,126), the driveway repair ($392,000), and the lease termination fee ($702,304), arriving at a gross savings figure of $7,685,055. In addition, Elior applied a 67% "participation adjustment" to the gross savings figure to account for the work done by Bailey on the lease assignment negotiations with Provender. (Ex. 27, ECF No. 92.)

147. Mohr rejected Elior's calculation of the fee it was owed and, to date, has not received any payment at all for the Berkeley Transaction.

148. With regard to its breach of contract claim, Mohr contends that it is entitled to summary judgment on the issue of whether it is entitled to receive its full commission as calculated under the ERA.

149. In its counterclaim for breach of contract regarding the Berkeley transaction, Elior contends that Macnoll's tender of an unauthorized offer to Provender changed the negotiation framework and forced Elior to pay unanticipated higher costs to Provender to complete the assignment of the Berkeley facility lease to Whitsons. As a result, Elior contends, it is entitled to an award of compensatory damages at trial.

150. Relatedly, Elior argues that Macnoll—as Elior's real estate agent—owed a fiduciary duty to Elior during his negotiations with Provender and that Macnoll's

mistake as to the terms of the offer he had been authorized to make constitutes a breach of that fiduciary duty. This allegation forms the basis for Elior's breach of fiduciary duty counterclaim.

151. The Court will now analyze the parties' respective claims regarding the Berkeley Transaction.

### 1. Mohr's Claim for Breach of Contract

152. The parties agree that a genuine issue of material fact exists as to whether Macnoll's conveyance of the offer in his negotiations with Provender constituted a breach of the ERA. Nevertheless, Mohr asks the Court to grant summary judgment in its favor on its breach of contract claim seeking payment of its full commission for the Berkeley transaction. In support of this request, Mohr argues that Elior waived any such breach by continuing to do business with Mohr thereafter.

153. Specifically, Mohr contends that Elior continued its contractual relationship with Mohr under the ERA even after it became aware of the purported breach. Mohr asserts that despite Elior learning of Macnoll's alleged mistake on 13 July 2022, it did not immediately terminate the ERA and instead continued to request the services of Mohr (through Macnoll) under the contract.

154. In making this argument, Mohr points to the fact that after the alleged breach incident, Elior allowed Macnoll to continue his efforts in assisting Elior regarding the subleasing of its Charlotte headquarters and facilitating Elior's move to a new office space. Based on the performance of these services, Mohr asserts, it

received a fee from Elior under the ERA. (Elior Rule 30(b)(6) Dep., at 118–20, ECF No. 67.)

155. Finally, Mohr notes that although Macnoll's alleged mistake occurred in July 2022, Elior did not formally take the position that the ERA was no longer in effect until August 2023.

156. In response, Elior contends that it continued to use Macnoll's services with regard to the roof and parking lot repairs that had to be made in connection with the Berkeley Property only because it would have been cost-prohibitive to bring in a new person to perform those tasks. Similarly, with regard to Macnoll's efforts related to Elior's attempt to obtain a new site for its headquarters in Charlotte, Elior contends that Macnoll had already been working on that project prior to the Berkeley incident such that it made sense to allow him to finish the job.

157. Elior further asserts that even though it did not provide formal notification to Mohr until August 2023 of its belief that the ERA was no longer in effect, it did not assign any *new* projects to Mohr during that time period.

158. Under North Carolina law, waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Bombardier Cap., Inc., v. Lake Hickory Watercraft, Inc.*, 178 N.C. App. 535, 540 (2006) (cleaned up). Our Court of Appeals has explained that the elements of waiver are:

> (1)    the existence, at the time of the alleged waiver, of a right, advantage or benefit;
> (2)    the knowledge, actual or constructive, of the existence thereof; and,
> (3)    an intention to relinquish such right, advantage or benefit.

*Dermitt v. Springsteed*, 2014 N.C. App. 325, 328–29 (2010).

159. The Court of Appeals has held that a waiver "may be either express or implied." *Medearis v. Trs. of Meyers Park Baptist Church*, 148 N.C. App. 1, 11 (2001). A crucial element of waiver is the intention of the waiving party. *See In re Pedestrian Walkway Failure*, 174 N.C. App. 254, 265 (2005) ("There must always be an intention to relinquish a right, advantage or benefit.").

160. A party's intention to waive a right can be implied "when a person dispenses with a right by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right." *Medearis*, 148 N.C. App. at 12.

161. The Court concludes that there is a genuine issue of material fact as to whether Elior waived Macnoll's alleged breach of the contract and that this issue must therefore be resolved by a jury. Therefore, Mohr's Motion for Summary Judgment as to its breach of contract claim regarding the Berkeley Transaction is **DENIED**.

### 2. Elior's Counterclaims for Breach of Contract and Breach of Fiduciary Duty

162. Mohr contends that even assuming *arguendo* that a triable issue of fact exists as to the waiver issue, it is still entitled to partial summary judgment in its favor on the issue of whether Elior would be entitled to recover actual damages (as opposed to merely nominal damages) at trial on its counterclaims. This is so, according to Mohr, because Elior has failed to put forth evidence that it suffered any actual damages from Macnoll's alleged error.

163. Under North Carolina law, proof of damages is not an element of a claim for breach of contract. *See Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, 2019

NCBC LEXIS 46, at *44 (N.C. Super Ct. Aug. 8, 2019).  As our Supreme Court has explained, a plaintiff is entitled to "compensatory damages only if he allege[s] and offer[s] evidence to satisfy the jury by the greater weight thereof that he has suffered substantial damage, naturally and proximately caused by the breach." *Bowen v. Fid. Bank*, 209 N.C. 140, 144 (1936).

164.    A claimant who prevails on a breach of contract claim but cannot show that actual damages were suffered from the breach is limited to an award of nominal damages.  *See Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.,* 132 N.C. App. 160, 172 (1999) ("In a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least.").

165.    In support of its contention that Elior has failed to show actual damages, Mohr initially relies upon the deposition testimony of Brian Herrmann (Elior's designated corporate representative) at his Rule 30(b)(6) examination, who stated as follows:

Q:      So do you agree that Elior has not been damaged in the amount of $702,303.66?

A:      Yes.

Q:      Thank you. Do you agree, Brian, that Elior has not been damaged at all as a result of Mohr Partner's involvement in the Berkeley transaction?

A:      I know that the original offer that Whitsons was looking for did not include a renewal option.  They wanted a right to review the market rent at the end of the Lease term to determine whether or not to renew.

Q:      I'm not asking you about Whitsons. I'm asking you about Elior.

A:      Could you rephrase the question?

Q:     Do you agree that Elior has not been damaged at all as a result of Mohr Partner's involvement in the Berkeley transaction?

A:     Yes.

(Elior Rule 30(b)(6) Dep., at 66.)

166.   In response, Elior contends that Herrmann submitted an errata sheet upon reviewing the transcript of his deposition in which he stated that he had misunderstood this line of questioning.  In the errata sheet, Herrmann stated that his answers to the questions of whether Elior had actually been injured by Mohr's actions in the Berkeley Transaction should have been "yes" rather than "no."  (Elior Rule 30(b)(6) Dep., at 284.)

167.   Elior is correct that under North Carolina law, a deponent is permitted to substantively change his prior testimony via an errata sheet.  *See Rel. Ins. Inc. v. Pilot Risk Mgmt. Consulting, LLC,* 2023 NCBC LEXIS 41, at **12 (N.C. Super. Ct., Mar. 16, 2023) ("This Court has held that Rule 30(e) "places no limits on a deponent's ability to make substantive changes to his prior deposition testimony on an errata sheet.); *see also Window World of Baton Rouge, LLC v. Window World, Inc.,* 2018 NCBC LEXIS 70, at *10 (N.C. Super Ct. Aug. 2, 2018) ("The plain language of Rule 30(e) permits a deponent to change the deponent's deposition transcript in form or substance, so long as the deponent sign[s] a statement reciting such changes and the reasons . . . for making them.").

168.   However, nothing in the errata sheet offers any actual explanation of *how* Elior suffered actual injury from Macnoll's alleged mistake.  Indeed, the change in Herrmann's testimony as contained on the errata sheet merely states as follows:

| Page | Line | Is Amended to Read |
|------|------|--------------------|
| 66 | 6 | Amend Answer to say "No" (Misunderstood the question) |
| 66 | 20 | Amend Answer to say "No" (Misunderstood the question) |

(Elior Rule 30(b)(6) Dep., at 284.)

169. As a result, even accepting the errata sheet as a legitimate clarification of his testimony, it is simply conclusory and therefore insufficient to support an award of actual damages. *See Intersal, Inc. v. Wilson*, 2023 NCBC LEXIS 29, *46 (N.C. Super. Ct. Feb. 23, 2023) (party claiming damages from breach of contract must prove losses with reasonable certainty, which "requires more than hypothetical or speculative forecasts"); *see also Innovare, Ltd. v. Sciteck Diagnostics, Inc.*, 2023 NCBC LEXIS 8, *31 (N.C. Super. Ct. Jan. 19, 2023) (rejecting basis for claimed damages for breach of contract as merely conclusory).

170. Moreover, additional testimony from Elior witnesses on this subject likewise supports Mohr's contention that Elior has failed to raise a genuine issue of material fact as to whether it actually suffered monetary damage due to Macnoll's alleged error.

171. For example, Hilton's testimony further supports this proposition:

Q: Elior did not sustain any financial damage as a result of the Berkeley conclusion and the Berkeley transaction, correct?

A: Not with how we got it done. Not with how we got it done.

Q:     So would your answer be no?

A:     Yes.

. . .

Q:     As you testified earlier, there was no economic damage to Elior, correct?

A:     I don't know. There could have been.

Q:     I understand it's your testimony that it could have been bad, but the result was not bad, correct?

A:     We got it done.

Q:     Okay. No damage to Elior?

A:     I don't know if I agree with that.

Q:     Okay. Please identify to us the damages Elior sustained during this five-day period between the July 13th terms and the July 18th terms?

A:     I don't know.

(Hilton Dep., at 130–31, 202–03, ECF 107.)

172.   To overcome Mohr's summary judgment motion on this issue, it was incumbent upon Elior to offer evidence sufficient to support a jury finding that it incurred monetary damages as a result of Macnoll's alleged mistake.  However, it has failed to do so.  Accordingly, Mohr is entitled to summary judgment on this issue, and at trial, Elior shall only be permitted to seek nominal damages as to its breach of contract claim regarding the Berkeley Transaction.  *See Am. Air Filter Co., Inc. v. Price,* 2018 NCBC LEXIS 73, at *11 (N.C. Super. Ct. July 10, 2018) (holding that a claimant who could demonstrate a breach of contract was entitled only to an award

of nominal damages where it had not "presented any evidence that it suffered actual damages").

173. Elior's second counterclaim for breach of fiduciary duty is likewise based on its assertion that Macnoll conveyed an unauthorized offer regarding the Berkeley Transaction.

174. "It is well-settled that to establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of the injury to the plaintiff." *Lafayette Vill. Pub., LLC v. Burham,* 2022 NCBC LEXIS 104, at *14–15 (N.C. Super. Ct. Sept. 12, 2022) (cleaned up).

175. Because of the genuine issue of material fact that exists over whether Macnoll actually conveyed an unauthorized offer regarding the Berkeley Property, Elior's breach of fiduciary duty counterclaim also raises a triable issue that cannot be resolved at the summary judgment stage.

176. For the reasons discussed above, the Court agrees with Mohr that Elior has failed to show actual damages stemming from Macnoll's alleged mistake. However, as with its breach of contract counterclaim, Elior will be entitled to recover nominal damages on its breach of fiduciary duty counterclaim at trial if it prevails on that claim. *See Chisum v. Campagna,* 376 N.C. 680, 704–05 (2021) ("potential liability for nominal damages is sufficient to establish the validity of [a] claim for breach of fiduciary duty"); *Kixsports, LLC v. Munn,* 2021 NCBC LEXIS 32, at *25

(N.C. Super. Ct. Apr. 1, 2021) (holding that absence of actual damages does not defeat a breach of fiduciary duty claim given potential liability for nominal damages).

177. Therefore, Mohr's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** as to Elior's breach of contract and breach of fiduciary duty counterclaims. To the extent Elior seeks summary judgment on its counterclaims, its Motion is **DENIED**.

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

1. Defendant's Motion to Amend is **DENIED**.

2. With regard to the issue of whether the ERA entitles Mohr to receive a commission on transactions self-serviced by Elior, Elior's Motion for Summary Judgment is **GRANTED**, and Mohr's Motion for Summary Judgment is **DENIED**.

3. With regard to the issue of whether Mohr is entitled to receive a commission in connection with its work on the Moosic Transaction, Mohr's Motion for Summary Judgment is **GRANTED**. The Court **DEFERS** making a ruling at the present time on the precise amount of the commission to which Mohr is due.

4. With regard to the Berkeley Transaction, Mohr's Motion for Summary Judgment on its own claim for breach of contract is **DENIED**. To the extent that Mohr seeks summary judgment on the issue of whether Elior is entitled to seek actual damages at trial on Elior's counterclaims for breach of contract

and breach of fiduciary duty stemming from the Berkeley Transaction, Mohr's Motion is **GRANTED**. However, to the extent that Mohr seeks summary judgment on Elior's counterclaims for breach of contract and breach of fiduciary duty stemming from the Berkeley Transaction *in their entirety*, Mohr's Motion is **DENIED** as Elior shall be permitted to seek nominal damages for those counterclaims at trial.

5. To the extent that Elior seeks summary judgment on any other claim in this action except as set forth above in paragraph 2, its Motion is **DENIED**.

**SO ORDERED**, this the 21st day of May 2025.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases